UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 15-10049-RGS

JOSEPH DRAPALA

v.

A.C. MOORE

MEMORANDUM AND ORDER ON DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT

February 12, 2016

STEARNS, D.J.

Defendant A.C. Moore terminated plaintiff Joseph Drapala as the general manager of its Dedham, Massachusetts retail store in June of 2014. Drapala was then sixty-six years old.  He alleges that the termination was motivated by age-based discrimination in violation of Mass. Gen. Laws ch. 151B, § 4.[1]  Discovery having been completed, A.C. Moore moves for summary judgment.

---

[1] Drapala voluntarily dismissed Count II of his Complaint under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 623.  *See* Dkt. ## 25, 29.  Drapala also did not oppose A.C. Moore's motion for summary judgment on his claim of intentional infliction of emotional distress (Count III).  Jurisdiction remains in by this court by reason of diversity of citizenship.  28 U.S.C. § 1332.

BACKGROUND[2]

A.C. Moore operates a chain of arts and crafts stores.  In 1998, when Drapala was 51 years old, A.C. Moore hired him as an assistant manager at its store in Warwick, Rhode Island.   The following year, Drapala was promoted to the position of general manager at A.C. Moore's Bellingham, Massachusetts store.  He remained general manager of the Bellingham store for 11 years.  In February of 2010, Drapala transferred to the A.C. Moore store in Dedham, Massachusetts, as its general manager.

As the general manager, Drapala was responsible for his store's sales, customer care, operational standards, and employee management.   He

---

[2] In reviewing the record, the court did not consider the declarations of Amy Deconincksmith and Nicole Pilgrim in support of Drapala's opposition as these two former A.C. Moore employees were not identified in Drapala's Rule 26 disclosures nor disclosed in response to defendant's interrogatory seeking the names of his potential witnesses.  Under Fed. R. Civ. P. 37(c)(1), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless."  Drapala contends that he could not, as an ethical matter, speak to the witnesses until after they had left A.C. Moore's employment.  However, Drapala identifies no rule or law that would have prevented his taking their depositions or asking them for sworn statements.  Indeed, Drapala deposed several current A.C. Moore employees, including Khalid Mardhy, Drapala's successor at the Dedham outlet.  Drapala's failure to disclose the two witnesses was also not harmless – A.C. Moore did not have an opportunity to examine them on the matters asserted in their belated declarations.

reported directly to a District Manager (Ron Last) who oversaw approximately ten stores. The District Manager (DM) in turn reported to the Regional Vice President (RVP) who was responsible for 140 stores in three separate geographical regions. At the regional level, a Loss Prevention (LP) Manager (Rigoberto Hernandez) and a Human Resources (HR) Manager (Bradley Godette) also had store oversight duties.

In late 2011, Sbar's Inc. purchased the financially ailing A.C. Moore chain. (Sbar's kept the A.C. Moore brand name). To lift performance, the new management shifted the focus from cost savings to driving up sales volume by increasing the variety and availability of merchandise. *See* Hernandez Dep. Tr. at 22-23. To that end, store managers were required to merchandise warehouse trucks[3] in one day's time (where previously they had been given two to three days). *See* Drapala Dep. Tr. at 59. Corporate management also exercised tighter control over the retail outlets by implementing regular new audits and requiring store managers to submit weekly plans. *See id.* at 57-58. In early 2014, A.C. Moore initiated the use of a DM site inspection form (visit form) setting out corporate expectations with respect to various aspects of retail store operation. *See id.* at 58.

---

[3] The term refers to the unloading of merchandise trucked to a store from a central warehouse and moving, organizing, and stocking the merchandise so as to make it immediately available for sale.

General managers were graded numerically on their progress in meeting these expectations during DM visits two or three times a month.  At about the same time, A.C. Moore created two additional RVP positions.  *See id.* at 59.  Each of the three RVPs oversaw some 50 stores in their respective region. *See id.*  Dolph Marinucci became Drapala's RVP under the reorganization.

Although Drapala had extensive management experience and had generally performed well at A.C. Moore prior to the Sbar acquisition, he did not consistently meet the objectives set by new management.  In the fall of 2012, Drapala received (documented) verbal counseling from DM Last.

> Joseph, you are not meeting company expectations in the following ways: . . . your Assistant General Managers (AGMS) have expressed concerns about their lack of training. . . . [E]mployees were not being held accountable for poor attendance. . . . The condition of the stockroom has continued to decline over the last two months.

Def.'s Ex. I (Progressive Disciplinary Record of September 5, 2012) at 1.  DM Last concluded that Drapala was deficient in "[i]ntegrity & [t]rust[, being r]esults [d]riven[, and p]lanning and [o]rganization."  *Id.* at 2.  Drapala was instructed to improve in "hold[ing] associates accountable for company policy and procedures[,] . . . ensur[ing] [he] ha[s] properly trained [his] management team, . . . [and] develop[ing] an action plan . . . to address [his] stockroom issues."  *Id.*  Drapala was warned that "[f]ailure to meet the

expectations . . . [and] to immediately improve . . . may result in further disciplinary action up to, and including, termination." *Id.*

In January of 2013, Drapala issued a final warning to a store employee without first obtaining the required approval from Regional HR. In March of 2013, LP Manager Hernandez visited Drapala's store to investigate a cash shortage, and while there, photographed boxes of merchandise and display items stacked haphazardly in the aisles. Around the same time, DM Last visited Drapala's store and gave him a three-page list of items that needed improvement. For one week in March of 2013, Drapala also failed to submit a payroll budget as required.

In April of 2013, Last provided Drapala with a written warning. Last faulted Drapala for "employees [] not being held accountable for leaving cash pickups unsecured overnight," and "not giv[ing the employee] any written documentation of the incident." Def.'s Ex. N (Progressive Discipline Report of April 16, 2013) at 1. Last remarked of the fact that A.C. Moore had lost an appeal of a former assistant manager's unemployment compensation case because the court credited evidence that Drapala

> was not consistent in holding [his] Associates accountable to the Company harassment policy. Specifically, [Drapala] partnered with Human Resources (HR) and [Last] when addressing the former AGM's harassment policy violations (leading to his termination), but in at least two other cases of potential

5

harassment violations, [he] did not partner with HR or [Last] (resulting in those employees remaining employed).

Last noted Drapala's explanation that he did not issue a Performance Discussion Record (PDR) for the unsecured cash pickup incident because no loss had been incurred by the company. However, "[t]wo weeks after this incident, money was again left unsecured overnight by other members of the management team, this time resulting in the loss of over $200." *Id.* Last again cited Drapala for deficiencies in "[i]ntegrity & [t]rust[, being r]esults [d]riven[, and e]xecuting [v]ision and [p]urpose." *Id.* Drapala was instructed to improve by "hold[ing] associates accountable for violations [of] company policy and procedures[,] . . . partner[ing] with [Last] and Human Resources when addressing policy violations . . . [and] involv[ing] [his] Assistant General Managers in the Progressive Discipline Process." *Id.* at 2. Drapala was again warned that "failure to immediately improve . . . may result in further disciplinary action up to, and including, termination." *Id.*

In May of 2013, Drapala received his performance appraisal for the calendar year 2012. Of a possible total score of 5, he received an overall rating of 2.85. The rating was above average compared to other A.C. Moore general managers and Drapala received a performance-based bonus. Last commended Drapala by stating that he

6

> [is] a strong merchant and ha[s] shown [he] ha[s] a vast knowledge of the craft industry.  [He] know[s] when items are in season and ha[s] done a good job promoting items at the right time.  [He] w[as] able to drive key seasonal items in the fourth quarter which ended up increasing department 18 sales by 21.8% and department 35 sales by 3.3%.  [He] ha[s] also done a good job with seasonal notes which will help to increase [his] stores sales next year.  [His] transition planning has been good all year long, [he] always ha[s] [his] store mapped out and [he] use[s] [his] space very effectively.  [He] [is] always focus[ed] on sales and profit and understand that [he] must continue to drive sale to increase [his] bottom line profit.  [O]nce again [he] delivered a sales increase of 6.3%.

Def.'s Ex. O (2012-2013 Performance Appraisal) at 2.  However, Drapala was graded as "need[ing] improvement" in "building effective teams" and "developing direct reports."  *Id.* at 1.  Last wrote that Drapala

> need[s] to do [] better with people development and accountability in 2013.  [His store] had several BA [(business abuse line)] calls related to human resource issue in the store and when an investigation was done we found that associates were not being held accountable for attendance issue[s].  There was an associate that had missed over 20 days of work in the first six months of the year and she had not been spoken to about her attendance issues.  Not only does this put the company at risk it created issues at store level.

> [Drapala] had issues with [his] two new AGM's and the[ir] lack of training they felt they received. . . . The other opportunity . . . was [his] stockroom standards.  The stockroom is a challenge because of lack of space but was not organized on any consistent basis.  The stockroom needs to become a priority in 2013.  We need to work on bin organization and overall floor condition in the stockroom.

*Id.* at 2.   DM Last recommended that Drapala "focus on improving [his] knowledge of the human resource aspect of the job.   [His store] had a considerable amount of HR issues and with a better understanding of HR [Last] fe[lt] [Drapala] would be able to resolve these issues at store level." *Id.*

In November of 2013, Hernandez completed an LP audit of Drapala's store and discovered that 21 of the 40 employees had not timely completely cash register certifications, that company-issued reward cards were being improperly used for refund transactions, that an employee was initialing all refunds over $15.00 even when she was not present for the transaction, and that cash variances were going undocumented.   A month later, Drapala's store failed a security audit conducted by Hernandez, scoring 70 points out of 100 (85 was the passing score).   Specifically, the audit found that the store was not processing freight within the required 24 hours, that the store aisles and stock room presented hazards, that two employees had not completed cash register certificates, and that Drapala was not printing and reviewing the required weekly Safe Reconciliation Summary or the Till Adjust Summary Report.

In January of 2014, Godette performed a payroll audit of Drapala's store and found that Drapala had failed to consistently document and

reprimand employees for tardiness and for working longer than six-hour shifts without taking a break, and that the store had numerous time card and pay discrepancies. Following this audit, Last issued Drapala a final written warning. In addition to the issues identified by the audits, Last noted that his recent DM visits had also revealed that the store had poor recovery,[4] and that the stockroom and the classroom were in unkempt condition. Last faulted Drapala once again for lacking "[i]ntegrity & [t]rust [, being r]esults [d]riven [, and e]xecuting [v]ision and [p]urpose." Def.'s Ex. S (Progressive Disciplinary Record of January 23, 2014) at 2. Last identified seven areas in which Drapala had to improve immediately or be subject to further discipline.

> The store must comply with all Planner set-dates and Plan-o-gram deadlines . . .[;] [w]alk your store daily to identify issues and opportunities and react immediately to areas of non-compliance[;] . . . [e]nsure established recovery . . . are in place and followed every day[;] [r]aise . . . expectations of your leadership team, and staff . . . [;] hold associates accountable for violations, as per company policy . . . [;] partner with me and with Human Resources when addressing all policy violations . . . [; and] get your store standards up to company expectations by 2/28/2014.

*Id.*

---

[4] Recovery refers to replacing sold merchandise (from stock) in its proper location on store shelves.

Drapala failed a further DM visit in February of 2014, scoring 73 points and coming up short in the categories of head count, freight processing, presentation standards, floral sales, floral production plan, and frame sales. The following month, Drapala scored 80.74 on an LP audit, performing poorly in security, human resources, electronic journal and back office review, receiving, stockroom, price integrity, inventory management, and custom framing.  In April, on the new DM visit form, Drapala scored only 70 points.   Last faulted Drapala for missing signs and labels, dirty store conditions, and short-of-expectation floral and frame sales.

Drapala received a cumulative grade of 2.22 (out of 5) on his calendar year 2013 performance review.  He was scored as "needs improvement" in four categories: integrity and trust, building effective teams, executing vision and purpose, and developing direct reports.  On a positive note, Last lauded "[Drapala's] merchandise knowledge [as] a true asset to the district."  Def.'s Ex. W (2013 Performance Appraisal) at 2.  However, Last also pointed to Drapala's shortcomings with respect to the rewards program, daily store standards on recovery, stockroom, office, bathroom and classroom cleanliness, and hiring and training of new employees.

In May of 2014, Hernandez conducted a re-audit of Drapala's store in the areas that had previously been found deficient.  The store scored 81.02,

and fell short again in the categories of human resources, electronic journal and back office review, stockroom, inventory, and custom framing. Hernandez also identified persistent issues with classroom and stockroom conditions, as well as numerous payroll discrepancies, and employees working longer than six-hour shifts without a break.  Subsequently, Last conducted a payroll audit and confirmed several occurrences of over and underpayments, tardiness, and employees working long shifts without a break during each week of May.

On June 6, 2014, Marinucci and Last visited Drapala's store together. Last's four-page handwritten notes from this visit reflect that the store lacked signs and labels in more than a dozen areas, and that the store was missing merchandise and had poor recovery in several departments.  On the same day, A.C. Moore terminated Drapala, citing his history of various policy violations, failed audits and DM visits, and poor store conditions.  *See* Def.'s Ex. BB (Progressive Disciplinary Record of June 6, 2014).  "Joe, due to the continued struggles with the store (as listed above) and the clear lack of progress since your previous Final Warning on 1/23/14, your employment with A.C. Moore is terminated effectively immediately."  *Id.* at 2.  This lawsuit followed.

DISCUSSION

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A material fact is one which has the "potential to affect the outcome of the suit under applicable law." *Nereida-Gonzalez v. Tirado-Delgado*, 990 F.2d 701, 703 (1st Cir. 1993).  For a dispute to be "genuine," the "evidence relevant to the issue, viewed in the light most flattering to the party opposing the motion, must be sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side."  *Nat'l Amusements v. Town of Dedham*, 43 F.3d 731, 736 (1st Cir. 1995) (citation omitted).

Mass. Gen. Laws ch. 151B, § 4 prohibits an employer, "because of the age of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual, or to discriminate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification."  Like federal age discrimination claims brought under ADEA, where there is no direct evidence of discrimination (as is the case here), the analysis of the parallel state law claim tracks the burden-shifting framework set out by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Wheelock Coll. v. Mass.*

*Comm'n Against Discrimination*, 371 Mass 130, 134-135 (1976).   Once Drapala meets his entry-level burden of establishing a prima facie case of age discrimination,[5] A.C. Moore must come forward with a legitimate, nondiscriminatory (convincing or not) reason for Drapala's termination. Drapala carries the ultimate burden of demonstrating that the reasons given by A.C. Moore for his termination are pretextual and a mask for intentional discrimination.

For purposes of summary judgment, A.C. Moore does not dispute that Drapala has made out a prima facie case.   In meeting its burden of production at the second phase of the *McDonnell Douglas* exercise, A.C. Moore relies on the thickly documented disciplinary record compiled over three years as support for the argument that it terminated Drapala because he failed to meet the expectations of the new management.   Drapala, for his

---

[5] The elements of a prima facie case under ADEA are

(1) that [Drapala] was at least forty years old when he was fired; (2) that his job performance met the employer's legitimate expectations; (3) that he suffered an adverse employment action such as a firing; and (4) that the employer filled the position, thereby showing a continuing need for the services that he had been rendering.

*Melendez v. Autogermana, Inc.*, 622 F.3d 46, 50 (1st Cir. 2010). Massachusetts law additionally requires that plaintiff be replaced by someone at least five years younger. *Knight v. Avon Prods., Inc.*, 438 Mass. 413, 424 (2003).

part, contends that A.C. Moore is using the disciplinary record as an excuse for age discrimination.

Under Massachusetts law, to defeat summary judgment through a showing of pretext,

> a plaintiff [must] demonstrate "that one or more of the employer's reasons is false," which showing, "combined with the evidence adduced to meet the employee's burden of proof under the first stage of *McDonnell Douglas*," permits (but does not require) the jury to "infer that the employer is covering up a discriminatory intent, motive or state of mind."

*Dyjak v. Baystate Health Sys., Inc.*, 945 F. Supp. 2d 197, 208 (D. Mass. 2013), citing *Lipchitz v. Raytheon Co.*, 434 Mass. 493, 501 (2001).  Drapala first attacks the contention that under Sbar's ownership, A.C. Moore imposed more stringent quality expectations on store managers.  Drapala insists that the company standards remained the same and that he consistently performed well by these measures.  The argument, however, is inconsistent with Drapala's own deposition testimony in which he conceded that after the acquisition by Sbar, A.C. Moore instituted new audits, inaugurated a new DM visit form, shortened the time allotted to merchandise warehouse trucks, required submission of weekly store plans, and created additional supervisory RVP positions.  *See* Drapala Dep. at 57-59.

In face of the disciplinary record, Drapala contends that the deficiencies with which he was charged were not material to his overall

performance. However, he has adduced no competent evidence to challenge their truth.[6] To take one example: Drapala admits that he did not follow company procedures in reprimanding store employees for policy violations, but maintains that he was motivated by fear of losing associates, or that the violations resulted in no financial loss to the company, or that they were only technical. *See* Opp'n at 6-7, 9. Drapala also admits that he did not always process freight within the allotted 24 hours, and that the classroom, stockroom, and back office were not always neat and organized, *see* Def.'s T (Feb. 20, 2014 e-mail from Drapala to Last enclosing action plan to remediate failed DM visit categories), but he argues that his shortcomings in these areas did not impact store operations or overall profitability. *See* Opp'n at 3-4. Drapala further admits payroll discrepancies[7] and missing labels and signs in his store, but dismisses these problems as minor and inevitable in operating a large retail store. *See* Opp'n at 10-11.

Drapala cites two Eighth Circuit cases in support of the argument that his termination was motivated by discrimination because his store

---

[6] Drapala signed each of his Progressive Disciplinary Reports. He did not make any documented challenges to any of their findings.

[7] On the issue of employees working longer than six-hour shifts without taking a break (which violates state labor law, *see* Mass. Gen. Laws ch. 149, § 100), Drapala oddly characterizes it as "a very positive point," because it "indicated that employees had been working consecutive hours to service[] the store." Pl.'s Resp. to Def.'s Statements of Facts (RSOF) ¶ 101.

performed well in terms of profitability, which he maintains was the only germane company performance measure.  Because A.C. Moore stipulated that profitability was not a factor in his termination, it follows, as Drapala sees it, that the company's reliance on his other admitted shortcomings is therefore pretextual.  In *Fisher v. Pharmacia & Upjohn*, 225 F.3d 915, 920 (8th Cir. 2000), the Eighth Circuit held that because "the selling of product is the primary responsibility of a salesperson and thus that sales volume is generally the principal indicator of a salespersons performance," a plaintiff salesperson's evidence of sales performance raised a sufficient issue of material fact as to whether he met the employer's legitimate expectations for purposes of making out a prima facie case of age discrimination.  *See also Keathley v. Ameritech Corp.*, 187 F.3d 915, 920 (8th Cir. 1999) (salesperson's sales volume sufficient to establish prima facie case), *abrogated on other grounds, Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011).  In contrast, the record here is uncontroverted that as a general manager (not a salesperson), Drapala had a wide range of responsibilities, including sales, customer care, store operational standards, and employee management.  *See* Def.'s Ex. B (General Manager Job Description); RSOF ¶ 7.  That he may have performed well in one area – profitability – does not establish that he fulfilled all the remaining, reasonably required duties of his position.  *See*

16

*Fisher*, 225 F.3d at 920 ("[T]hat a nursing home administrator was skilled at managing finances did not establish that she had met her employer's legitimate expectations where the record also revealed that she was deficient in other skills – leadership and communication – vital to her job as administrator.").

The more fundamental point is that the court does not second guess a company's nondiscriminatory business decisions.

> Even were we to conclude that [plaintiff] is correct [that the employer should have used different metrics in deciding layoffs], our task is not to evaluate the soundness of [defendant's] decision making, but to ensure it does not mask discriminatory animus. *See Mesnick v. General Elec. Co.,* 950 F.2d 816, 825 (1st Cir.1991), cert. denied, 504 U.S. 985 [] (1992) ("Courts may not sit as super personnel departments, assessing the merits – or even the rationality – of employers' nondiscriminatory business decisions").

*Sullivan v. Liberty Mut. Ins. Co.*, 444 Mass. 34, 56 (2005).  If A.C. Moore had decided to grade its store managers by their skill at fly fishing or their fluency in ancient Greek, it wouldn't matter, so long as whatever criteria the company chose were not proxies for discrimination.  Here, there is no evidence that A.C. Moore's rather conventional performance expectations of

its store general managers were imposed for any other reason than to improve the prospects of a failing business.[8]

Because Drapala has failed to show the existence of a material dispute of fact as to whether A.C. Moore's stated reasons for his termination were pretextual, no reasonable jury could conclude that his termination was attributable to age discrimination.

## ORDER

For the foregoing reasons, defendant's motion for summary judgment is <u>ALLOWED</u>.  The Clerk will enter judgment for defendant and close the case.

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE

---

[8] As a parting shot, Drapala characterizes two statements that he alleges Last made to him as displaying an animus against older employees, namely that "senior managers had targets on their backs," and that Last "would not sacrifice his job" to save Drapala's.  Drapala Aff. ¶ 33.  The court does not read these statements as containing anything remotely suggesting an animus against age.  Nor until this pleading did Drapala so interpret them. Indeed, Drapala earlier testified that no one at A.C. Moore had ever made a comment about his age over the entire course of his employment there. Drapala Dep. at 290.  Even if in some respect Last's statements might lend themselves to a more suspect interpretation, it is well settled that stray remarks are insufficient to satisfy a plaintiff's ultimate burden of proving discrimination.  *See Ayala-Gerena v. Bristol Myers-Squibb Co.*, 95 F.3d 86, 96 (1st Cir. 1996).